Good morning, Your Honors. My name is Susan Jane Brown, representing the plaintiffs' opponents in this case. Before I begin, I'd like to reserve five minutes for rebuttal, if I may. Of course. Thank you. You know, before you get started, I've run into something in my review that I'd like to clear up, so that I make sure that you, Jess, I'm sure, would help me. The standard we're playing here with an appeal from a denial of preliminary, or yes, a denial of a preliminary injunction. And the standard revolves around the combination of probable success on the merits and the possibility of irreparable injury, or that the serious questions are raised and the balance of hardships tip sharply in the favor of granting the injunction. Now, if we look at the landscape, I've found three things that are troubling to me. Native Ecosystems Council v. US Forest Service, a case of our court, Ecology Center v. Austin, and the District Court case of ONRC v. Bong, which was appealed to our court and argued in December 7th of this year, and is now pending. The Bong case is right on target on old forest growth and large snag removal. Ecology Center sets the standard for that under the guidelines and standards. And Native Systems is just a removal for effects on hiding cover for big game, but it sort of runs in the eco. Now, having said that, how do these three cases, which are all ahead of us, and which could decide issues relative to standards and guidelines in the old forest growth treatment process, how should we look at them when we look at the review for the denial of preliminary injunction? Well, Your Honor, I think that starting with the ONRC v. Bong case, I think that as we did argue in our briefs, that opinion out of the District Court, which, again, has been argued to this court, is instructive to this panel. We believe that that case was correctly decided. But, you know, who knows what the panel is going to do? Correct? We don't know. But it was argued recently, correct? Correct. According to my notes, I noticed the same thing as Judge Brunetti, that it was argued back in December. Right. So what is the effect of those cases in our stream of navigation here? We've got to navigate. We're behind those cases. Right. And especially Eco's center is a final decision, and that's on target, too, although there's a petition for a re-hearing pending. But how do we do those with regard to evaluating your appeal here and the standard of review for issuing that preliminary injunction? Well, Your Honor, in this particular case that I'm arguing today, we're looking at a denial of a preliminary injunction. So the standard of review is slightly different. In the ONRC case, for example, that was a summary judgment case. So there is a different standard of review there. And what we're arguing in this case is that the district court did not correctly apply the law at issue. So I think that it's incumbent upon this Court to look at, of course, the facts of this particular case and the law that is at issue, as well as the facts and law that are at issue in those other cases that you mentioned. Let me be a little bit more direct. If the panel handling the Bong case, let's say, affirms the district court's decision. Yes. What does that do to your position before this panel? I think that that supports the plaintiff's case in this present case. Okay. Would that suggest that the district court got the law wrong and therefore abused its discretion in not granting the preliminary injunction? Yes, Your Honor. Do you think it would be prudent for us to wait for the decision from the Bong panel? I think, Your Honor, that if I was in your shoes, I think that it would bear discussion with that panel. There was another case that was also ---- Well, we don't discuss between panels. However, I think you're avoiding ---- I didn't quite phrase my problem. If, in fact, this is so serious that, in effect, we could get a decision that would control our case, all these other cases have either been stayed or denied and no logging is going on. Logging is going on right now, as I understand it, in your case. Yes. We denied the stay pending appeal. Yes. Should this court issue a stay pending our appeal in light of this traffic? Maybe you don't understand what I'm trying to say. We've got a lot of traffic ahead of us. How does that affect the irreparable injury, this balance, this sliding scale? You haven't addressed that because if you can't show that there was no abuse in denying this injunction, nor was there any abuse when we denied the stay. Yes, Your Honor. So you're wide open here. With all this stuff in the way, lumber is being cut in your area. Right. So what should we do about this? Well, Your Honor, I would advocate, again, that this Court revisit that decision or the motions panel issued or failed, did not, excuse me, did not issue a stay pending appeal. And we think that one is appropriate. There is logging. Well, why? You still haven't. The only way you're going to get there, I think, is through these three cases. At least, that's my problem. That's my problem. Right, Your Honor. And I would submit that we have demonstrated irreparable harm, and it was error for the district court to deny the preliminary injunction based on the harm that we had demonstrated in that particular, in the district court. Well, then address the chance of success, because irreparable harm won't do it. It's that sliding scale. So what's going on in the law area that would shift toward irreparable harm and that we should issue a stay or that there should be a reversal or denial of that preliminary injunction? Well, Your Honor, if I may, I'd like to get into the merits of our appeal, and I think we can address that. And I think the first issue that I'd like to begin with is the major issue, I believe, that's in this case. There are three claims, but the major issue is whether or not large-diameter snag removal from a late-successional reserve or LSR is consistent with the Northwest Forest Plan. And there are four things that the Forest Service must determine when deciding to approve post-fire logging in a late-successional reserve. The first is whether or not the activity is consistent with late-successional reserve objectives. And in this case, that is the development of late-successional features, namely snags, which are large standing dead trees. And in this case, I don't think that there's any question that that is the objective at issue, is developing this particular feature on the landscape. The second determination that the Forest Service must make is whether or not the project ensures habitat suitability now and in the future. And in this particular case, what you have is a record full of admissions from the Forest Service that the particular project, the B&B project, does not ensure habitat suitability now, i.e., right after logging is complete, because there's old-growth habitat and species that will decline immediately post-project. And that is replete throughout the administrative record where the Forest Service makes those admissions. The second issue is late-successional habitat in the future. And the way that the Forest Service says that it's going to create old-growth faster by implementing this logging project is by replanting. Now, the problem with this reliance on replanting and therefore allegedly growing more old-growth sooner than no action is that the Forest Service has indicated throughout the record that it can't actually fund this type of activity, that it's going to cost at least $3 million, and that the Forest Service doesn't have this money and is unlikely to get it in the future. But even if the Forest Service does have that money, the record also indicates that reforestation will not grow large trees faster. For example, there's a quote in the record stating, quote, it is hard to say that we will get large trees sooner than with planting. And this excerpts a record 349. And even if replanting were to occur, quote, snag recruitment inside the project area will not occur for approximately 50 years and then will consist of primarily smaller, i.e. less than 10 inches in diameter, snags. Doesn't that walk us into ECO Center and the standard there that was decided by our case, that seems to fit your picture, that the Forest Service only offered hypotheses and no clinical proof that the proposed action would not harm old-growth species? Correct. I mean, isn't that where we're, that's what I'm worried about in these cases. You've talked about all this mechanics and all, but I think we've put a pretty high standard up with the Ecology Center, unless I've missed something. No, I think that's right, Your Honor. Well, tell me how it fits your case. Well, because what we're talking about here is, again, another forest plan standard. The Forest Service must clearly demonstrate that its project will not be, or excuse me, will be consistent with the Northwest Forest Plan. Well, they did. They said they were going to leave some big trees over 16 inches in various areas, and they also indicated that they were going to leave certain snags. Did we address that in ECO Center, and does ECO Center apply to your case? I think that that case is, it does address forest issues in general, but it does not address the specific standards and guidelines that are at issue in this case, which is the Northwest Forest Plan. I thought it did. Maybe I missed something. No, it does not, Your Honor. Okay. So that would be distinguishable, then? Correct. Because in the Northwest environment, or excuse me, the ONRC v. Braun case does address the particular standards and guidelines at issue. Braun raises one of the issues you're raising here directly, doesn't it? One of the issues. One for sure. One for sure, yes. And then there's also a cumulative effects issue as well, but it's in a different context in this particular case than in the Braun case. So, again, I would submit that when you look at the four standards for the four determinations that the Forest Service must make in determining whether or not a post-fire project is consistent with the Northwest Forest Plan, the four determinations at issue in this case, the record actually demonstrates plaintiff's position that it is not, the project is not consistent with the Northwest Forest Plan. The third determination that the Forest Service must make is that the project focuses on retaining snags likely to persist until the next stand develops and is again producing large snags. And what we have here is a record that, for the agency, that snags greater than 16 inches in diameter will persist across the landscape, and that the particular timber sales in this case target removing those large diameter snags that will persist. So, again, it's a clear, it's a facial inconsistency with what the Northwest Forest Plan requires, which is retaining the snags that are likely to persist. That issue is now, that issue is in the Braun case. Yes, it is. Yes, it is. And then the fourth consideration that the Forest Service must look at is the Northwest Forest Plan's prohibition that states that salvage will not be driven by economic factors. And what we have in this particular case is a project that definitely does focus on economic factors. As I read the Forest Plan, it doesn't seem to preclude consideration of economic factors. No, Your Honor. It didn't even acknowledge that. Correct, and we are not arguing that economic issues cannot be part of the project. What we have argued is that the project cannot focus on, cannot be driven by economics. And in this case, it clearly is. What suggests that it's clearly driven by economics? Well, I think there are several factors, predominantly being the fact that the Forest Service declared an emergency situation determination in this particular case, and based on the economic loss to the government if implementation of the project was delayed. So here, the whole reason why this project is expedited is because of economic considerations. Well, I think that there's also evidence in the record that the resource is deteriorating. Now, whether that's been disputed or not, I don't know. So you have to analyze that harm also, unless you're going to eliminate commercial aspects of this environment. Correct, Your Honor. But again, there are lots of hypotheticals that we could discuss like that. But what we have here in front of us is a case where the Forest Service has decided to expedite implementation based on economic concerns, that the implementation that's actually ongoing now is focusing on large diameter, economically valuable trees. Other areas of the project that were originally part of the sale that were then dropped were because they were not economically viable or would have required costly, again, economic methods of logging like helicopter logging. So again, and our brief talks about, we cite several instances where we talk about how the Forest Service states, for example, the project's purpose and need is the recovery of wood products. That is an economic driver. And the Northwest Forest Plan is very clear that in late succession reserves where habitat and development of old-growth forests is supposed to be the goal, you cannot focus on economic recovery. And that's exactly what's going on here in this case. Now, let me ask, if I'm not mistaken, the Forest Service says, well, removal of these snags in this area, you know, everybody acknowledges that that's going to happen, but over the entire forest area, there will be enough remaining snags left in place, sort of this averaging. This averaging idea, yes. Now, what's wrong with that? Well, there are a couple things wrong with that. The first is that when you're looking at averaging snags across the landscape, the areas that are actually going to be logged will, in many cases, be devoid of large snags. And so there's not the habitat there for the late successional species that need it. And we cite in our brief where those citations in the record can be found. The other thing to keep in mind here is that the Northwest Forest Plan, the standard that we're talking about is, quote, following stand replacement disturbance, management should focus on retaining snags likely to persist until late successional conditions have developed and the stand is again producing large snags. So the standard focuses on management. And management is what happens inside the logged areas. That's where the management that we're talking about is the logging. And so management, the logging, must focus on retaining the large snags. So we're talking about what goes on inside those logged areas, not areas outside of the actual harvest areas where there may, in fact, well be habitat out in those areas. But the Northwest Forest Plan isn't focused on areas that are not managed. It's focused on human intervention into the landscape in late successional reserves. And so our position is that the plan specifically says that averaging, looking broader, is not okay to meet the standard, which focuses on management inside the harvest areas. Are you saying the rod and all the EIS and the science involved then is defective because they've set out a program of leaving certain snags in certain places? Are you saying the science is defective? I don't think that the science is defective because one of the issues that we discussed in our brief was whether or not, for example, clumping of snags is okay. And we haven't disputed that the science says, yes, clumping snags is probably better for wildlife. The problem is where that clumping happens. And as we pointed out in our brief, that clumping often happens on areas outside of... Yeah, but is that part of the science? Because even though Ecology Center doesn't involve the same standards and guidelines, it does sort of set up how you judge the standards and how they're applied in the science that is used. And they were pretty strict on how they substantiated that. Is that an element in this? In other words, if you're going to say that the clumping can occur but it's in the wrong place, is that questioning the basis of it that doesn't have any factual scientific base? What's going on there? Well, Your Honor, we're not trying to challenge the science. We're not saying that the science is bad. What we're saying is that the way that the Forest Service has decided to implement the science is inconsistent with the standards and guidelines, which is the controlling law that the Forest Service must operate in that framework and apply the science consistent with what those laws require. Is this averaging concept at issue in the Braun case? Yes, it is, Your Honor. And in that case, the district court held that that was not an appropriate way to comply with the Northwest Forest Plan. So presumably there will be an issue on review, right? Yes, Your Honor. And if it's all right, I'd like to remain my... I'll make sure you get your form. I have just two minor procedural questions. Yes. How far along? Do you know how far along the logging is today? You know, that's probably a better question for the government. My understanding is in December that much of the logging was complete. However, I would argue that this case is certainly not moot, even if logging was complete. The Ninth Circuit has been very clear that the hallmark of mootness is not completion of a project. I'd be happy to submit additional briefing on that issue if the court would like to hear it. The logging did start mid last year. Is that when it started? It started August, I think, of last year, so it's been ongoing. As soon as the record of decision was signed, pretty much logging started shortly thereafter. Now, you didn't file for a TRO before the contracts were left. Yes. Was there a strategic reason for that? Yes. Yes means you did or you didn't. I'm sorry? Yes means you did or you did not. We did not file for a TRO, and the reason for that was that we were attempting to work out a schedule with the government and the interveners regarding the logging. We were hoping to work out a briefing schedule that, if we did not prevail on injunctive relief, that we could appeal to this court as fast as possible. And so rather than go for a TRO, which is not reviewable by this court, we decided to brief a preliminary injunction instead, which is reviewable. Okay. Thank you. Thank you, Your Honor. May it please the Court. Lane McFadden for the Forest Service. With me at council table is Julie Weiss for the interveners. Is the logging complete on these sales? No, Your Honor, although it is close. There are three sales. The little sale is 100 percent complete in terms of logging. The butte sale, I believe, is something like 77 percent complete, and the booth sale is 85 percent complete as of a couple of days ago. So that gives you about an 83 percent completion rate for the project. When I say completion, I mean in terms of the timber being harvested. There are still other contractual obligations, which the contractors haven't finished, things like disposing of slash and stuff on the ground, taking care of the roads. Well, but the objects of interest, the snags and the removal, that's 80 percent complete. That's correct, Your Honor. Slightly more than 80 percent complete. So you're not arguing mootness, are you? No, Your Honor. We are not arguing mootness, not at this point. I'd like to address first the point which — Let me ask you, how much longer do you think it would take for them to complete the removal of the 17 percent or so? That's a lot of scanty. Your Honor, I actually don't know the answer to that question. I suspect the interveners might know. I know we've been delayed here for a while because of the snow, but I'm not certain. Being from the East Coast, I'm not sufficiently familiar with the weather to tell you when we can get started again. It may not be until the springtime, then. Yes. Barring any sort of injunction, it would all be done by springtime this year. And I assume when you say 80 percent complete, that means if there are so many snags to be removed or product to be removed, 80 percent of the actual product removed has been removed. That's correct, Your Honor, yes. All the snags, for instance, in the Littlesale, which is now 100 percent complete, all the snags that would be removed there are being removed. Of course, that's not actually an issue because that's not part of the late successional reserve, so the snag issue isn't a part of that. The Littlesale, you're saying? That's the Littlesale. It's on land designated as matrix, which is a land designation the Forest Service uses, and it's cultivated for its temperate reserve. So the 20 percent is on land reserve. I'm sorry, Your Honor? The 20 percent is then on lands that are subject to the standards and guidelines. That's right. All of the logging that remains would be on the land subject to standards and guidelines. That's exactly right. I want to address the Court's concern about cases pending before this Court, which might, I guess, there was some indication you thought it might control this opinion. Well, it's not a question whether or not it will because they're prior in time and under our circuit laws and procedures. Once whatever happens to that case ahead of us on the Braun case, whatever happens, it will be controlled. Well, Your Honor, there's two things about that. One is this is simply the review of a denial of a preliminary injunction. And so considering the standard about whether or not the district court abuses discretion, none of these cases which may be decided by the Ninth Circuit would establish law. Even Ecology Center v. Austin, which is now a final opinion by this Court, were not before the district court when it made its ruling. And so there's no evidence that there was an erroneous ruling of law or an error of law committed by the district court in this case. Maybe I fell off the wagon here. If, in fact, these cases decide the substantive issue about the harm in applying guidelines and standards, that will affect the chances of success and the sliding scale in determining whether there should be a stay or an injunction. You're saying that could not happen in these decisions in Braun? No, Your Honor. I think if this Court came out in Braun upholding the district court's original decision in Braun, although, as you see, there was some later change in the district court's opinion as appended to our briefs, that would affect their likelihood of success on one of the issues being raised, yes. So let's assume they go right down the line. You're going to say that you still – and let's assume that we then have to consider that as to whether or not the preliminary injunction was issued or whether a further stay should be issued. How do we avoid that, or what would you say – how would we treat that decision in Braun? Well, I think even if this Court did, of course, go against the Forest Service and rule that, that still might be some small indicator of success. There's two answers. One is that, you know, this Court is being moved for a stay pending appeal. I mean, this Court was moved for that relief, and that was denied. And so the question is whether or not the district court properly applied the correct legal standard. And the district court did. I mean, that's the sort of limited scope of review of this argument. And also, I mean, even if you disagree with that and you think that there is some new likelihood of success on the merits, you would then look at the balancing of hardships on the other side, and they still would weigh in favor of the denial of the preliminary injunction, as the district court saw it. Well, you know, in determining whether or not the district court judge either abused his discretion in granting or denying a preliminary injunction, one of the questions we ask is whether or not the district court applied the correct legal standards. That's correct. And one of the issues that we've been asked to decide is, you know, the removal of these snags, which is the same identical issue that's in the Braun case. And under our internal operating rules, that prior panel has priority over that. Well, okay. And if they come out, if they affirm what the district court did, we're going to follow it. Very well. But that doesn't count right in the district court's balancing of – I mean, that's why the – I'm sorry? If the district court misinterpreted the law, got the law wrong, that might well – as Judge Burnetti said, that might well tip the balance. It might. I mean, obviously, we don't think the district court got the law wrong, but also the district court – Well, let me ask this question. Do you see any reason why this panel should not wait until Braun is decided before we rule on this case? I just don't think it's necessary, Your Honor. I just think that you simply have to ask whether or not the district court put the law in front of it. And at that time, Braun was simply an unpublished district court decision. There was no ruling from the Ninth Circuit. There's no law about this. No, but presumably, whatever Braun says, you know, has always been the law, right? And that's the law that the district court should have recognized. With that view, Your Honor, you may be right. Is that the theory? Well, you also made an argument just briefly, and correct me if I'm wrong, and you said that we can just disregard that other district court. It's meaningless. It's not controlling. We could use every word of that district court and make that our opinion at any moment. And so it is relevant. So the point is do we just ignore it and say, well, even if we adopt it, it wouldn't affect the discretion that was exercised by the district judge. He saw that other opinion. He could also follow that, or he could adopt that argument. I think that's exactly right. So what you're saying is that no matter what Braun says, it will never have any impact on the injunction that was denied in this case. Yes, Your Honor. That is correct. With this limited scope of review, this Court can still issue a decision affirming the district court's denial of a preliminary injunction and not concern itself with the merits of the case, which may be in the future decided. I see my – actually, I miscounted mine. I'm having trouble with the map and the clock. Sorry. One other issue that Your Honor has expressed concern about was the averaging of the snags. Again, this is obviously going to be addressed by the Braun court. That's correct. It's also an issue in Braun. That's right. And I just want to clear up a mischaracterization by the panelists in this case. I mean, there's no – the Forest Service didn't devise a strategy where they said, well, we look at the forest as a whole and we want, say, a third of the snags to remain standing. And so as long as they're standing, it doesn't matter to us if there are clear-cut harvest units within that. That's not at all what the Forest Service's strategy is in this case. Every harvest unit is subject to some level of snag retention. And there's very specific numbers, which are described in the briefing. You'll be subject to two of the snags likely to persist per acre in each of the harvest units. And any of the larger units, 40 acres or more in size, will have an additional 15 percent preserved. And the FBIS is very detailed about this and also very detailed in its addressing of the suitability of the habitat this will provide for and its compliance with the Northwest Forest Plan. I mean, again, as I just spent the last 10 minutes telling you, we don't have to resolve the question of law as to whether or not this is compliant with the Forest Plan. It's got to be – we want to be very clear that the Northwest Forest Plan nowhere prohibits the removal of any large snags or those likely to persist. I mean, the arguments on the NIFMA side of the arguments presented by the plaintiffs all rely on the assumption, I guess, that the habitat hasn't burned yet, that its late dissectional reserves are in pristine LSR condition and that the Forest Service is going in and removing key elements of those. And that's simply not the case. What happened is that 90,000 acres of land were burned and these 6,800 acres that the Forest Service is treating with salvage logging, their ability to provide LSR habitat has been essentially destroyed in a lot of ways. And so the snag retention policy addresses that and preserves snags for the species that will need them in the interim. The other thing that the plaintiffs have failed to address throughout this litigation is the fact that whether or not the Forest Service takes any action, these snags are going to fall down and there's going to be a period of time where they're simply not there. And reforestation will lead to a faster regeneration of snag, what we call snag recruitment in the FEIS. The arguments presented by the other side all hinge on the assumption that if we were just to leave them alone, they would all be there until the new snags grow up, and that's simply not the case. Under no scenario are they going to persist that long. A couple of other points hit by the plaintiffs in this case is about the focus on economics in the FEIS. And the FEIS is quite clear that while, yes, there is an attempt to recover the economic value of this timber, there's also a lot of other very important purposes of the case. Reforestation, obviously, closure of the roads and reducing hazardous fuels, public safety insurance, what have you. Just as the Northwest Forest Plan does not say that you cannot, after salvage, remove any large snags, it does not say that you cannot consider economics, nor does it say you cannot have as a primary purpose economic concern. The sole citation of the record, which the plaintiffs have trumpeted before this court time and again, is in the response to public comment, and the comments are being very concerned that the Forest Service would only care about economics. What doesn't appear to be the only issue? Did you say it does appear to be? It does not appear to be. No, Your Honor, it is not. There are a lot of major other characteristics of the project, and I just simply wanted to point those out. Well, I have a problem with that because I was listening to your argument, and I was thinking again about the Braun case. The Braun case would go to the underlying issue relative to the substance of these standards and guidelines in removal of snags. So your theory about whether you remove them or a fire burns them later will all be fettered out when you get to the merits, correct? That's not issued yet. And that may or may not be decided in Braun. I'm looking at the district court opinion, roughly three pages. There's no analysis whatsoever of the underlying issue, but what the judge did is he ended up talking about the economic issue of the decaying and dying trees. And so never did he ever address the underlying issues that might have been raised by Braun or the underlying issues about the chance of success. He does recite the standard, the standard of success, or the probability of success would go into the equation relative to the injunction. Let's bring it down to home floor appeal. When we look at that decision, what do we do? We don't have anything here from the judge that tells us about the chances of success, so we've got to look outside. That's why we looked at Braun. That was my only recourse. What else can I do? The judge didn't do it. What the judge said here was we have economic loss, and that trumps everything. There was no balancing done by the judge, so we've got to do it. That's why we asked you about Braun. Well, Your Honor, when looking at the district court's opinion, granted his findings affect conclusions of law quite cursory, and he does not cite Braun or does not go through a written analysis of the law, but the ruling was made initially from the bench, and you can see this at page 413 of the intervener's supplemental excerpt where the judge does discuss his conclusions of the law and does find that they have no likelihood of success on the merits, and that's after an extended discussion in front of the judge of Braun specifically and also of other district court cases from the same district court which go the other way from Braun, and Braun is, of course, not the only district court decision that addresses this issue. Well, maybe we're getting too technical, but the only written findings are the ones in the three pages. Are you suggesting then we go back and if we review the transcript, then there's going to be evidence that we could use to determine the discretion issue, or are we stuck with these written findings? No. I think that the transcript certainly buffers the fact that the district court had all this in front of him and had considered it explicitly and did not abuse his discretion, but you don't have to dig through it to find it. His conclusions are at the end of the day, and he very clearly states, this is my finding. I'm going to deny the preliminary injunction on the following basis. Did you want to save some time for your colleague? Yes, Your Honor. Thank you. I hear her behind me, so I'll sit down. Give me a little anxious there. Please support. My name is Julie Wise, and I represent the intervener of Pelley's Boise Building Solutions Manufacturing, Interport Pacific, and the American Forest Resource Council. Boise is the purchaser of the Little salvage sale, and that is the sale that is in matrix, and it is completed except for perhaps a little bit of cleanup. Interport Pacific is the purchaser of the Booth and Butte sales. Butte is almost done, about two days' worth of work remaining, and Booth is not completely done. Is there ongoing work right now? No, sir, there is not. In fact, the purchasers do not expect, Interport Pacific does not expect to be able to get back into the area until June because of the weather conditions in the area. So nothing is happening right now, nor is it expected to happen until approximately June. And then how much time would it take them to finish the work? Your Honor, I can't answer that question. You have an idea? It really depends on where the units are located and the volume of those particular units. Okay. But it was two days on one and then something else on, and that was Booth, two days? That is Booth, yes. And the other one? Excuse me, Butte is two days, and Booth is an unknown amount of time remaining. Okay. And how much has been removed from Booth? Your Honor, I think it's approximately, I believe it's more than half of the sale volume has been removed from Booth. Okay. Thank you. Your Honors, the district court did not abuse its discretion in deciding not to enjoin this project. The district court found that there was no evidence of irreparable harm. I would certainly be happy to talk about harms, but this court appears to want to go more towards the merits and whether or not the district court got the law right. However, I would urge you to look at the record, look at the transcript, and realize that there was a full day hearing in which the district court heard testimony from witnesses from all of the parties. And at the end of that long day, the district court said that he had found no evidence of irreparable harm. Irreparable harm is a necessary showing. There was no irreparable harm, and we have discussed that thoroughly in our briefs. And rather than going back over that, what I'd like to do is tell you why Native Ecosystems, Brong, and the Austin case, which is the Ecology Center versus Austin, do not mandate a particular outcome in this case. First of all, those cases were actually decided on the merits. Those are not preliminary injunction appeals. That's a very big difference. But assuming that you want to go just to the law, I would, first of all, ask you to look at the Ecology Center versus Austin decision, in which there were a number of conclusions reached that do not apply here. So Ecology Center versus Austin, Your Honors, in which the parties have asked, the appellees have asked for rehearing or rehearing en banc, there were three types of things that the court looked at. The court looked at old-growth habitat treatment. That is not happening in this case because the old-growth habitat treatment that the court was talking about in Austin was the thinning of live old-growth. That is not this case. The court also based its decision regarding this old-growth thinning, the removal of live trees, on the National Forest Management Act's viability diversity requirement. That's not what has been argued in this case. I urge you to look at Loud's brief. The only claim that is being made under the National Forest Management Act is that somehow it is improper to remove any snags from late successional reserves. They do not claim that. One thing about the Ecology Center case was that the court, the opinion, had a serious problem with the methodology of the treatment plan. And that's one of the complaints here about the methodology here, for example, of averaging, which is an issue in Bronx. Yes, Your Honor. And the methodology that they were talking about was a thinning of old-growth, live old-growth, when that old-growth was, in fact, the proxy for the diversity and viability of old-growth species. Those issues are not before you. I urge you to look at Loud's brief. The National Forest Management Act claim says only that it's improper to remove snags from LSRs. Despite the fact that we have demonstrated in our briefs that there won't be any snags left by the time these areas are going to be generating new snags, the requirement under the National Forest Management, excuse me, under the Northwest Forest Plan is to retain sufficient number of snags that are likely to persist until the stand is again producing its own snags, which is about 80 years. The record in this case demonstrated that that was not going to be happening. All the snags were going to be gone. This is another reason. I want to quickly jump to Bronx as to why Bronx would not be determinative, regardless of what the Court decides. In Bronx, Bronx was a case that involved the Federal Land Management Policy Act. It was on BLM lands. That's not the determinative issue. The determinative issue is that each of these cases has a different snag retention policy or plan. No forest is identical to another forest. The forest in this case, the Deschutes, is not identical to the ranger district that was at issue in Bronx. But they're using the same, I'm trying to, I couldn't find the acronym. It's the BIO3 or what is that? Excuse me, Your Honor, I'm not sure. There's some kind of a system that used the BIO3 or, maybe I've got the wrong, it was an acronym for some process that's being used both in Bronx and in this case. Are you referring to DECADE, Your Honor? DECADE, excuse me. And DECADE is simply a methodology by which. Exactly. But see what I'm getting at here? My concern is if we get away from the specifics of each individual sale, and if ECO Center has set up a standard or if there's some legal, forget about the harms analysis, if there's some legal analysis that says that the methodology was flawed, then the question is does that shift the analysis for the preliminary injunction. That's all. Your Honor, I see I'm out of time. May I briefly answer your question? Yes. You can answer just for next question, please. Your Honor, first of all, regardless of the outcome of Bronx, assume the worse and this Court decides to wait and Bronx is upheld in every particular, I would urge Your Honors to look at the case law that states that an injunction does not inexorably issue, even in the face of a violation of an environmental law. We do not believe that Bronx Ecology Center or Native Ecosystems require a particular outcome in this case, in this preliminary injunction appeal. But even if you do feel that way and Bronx were to be decided, upheld in every particular, that would not mandate an injunction in this case. And we could refer Your Honors to the Romero-Barcello case, Amoco production company versus Village of Gambell, a number of other cases in which injunctions do not inexorably issue in face of a violation of an environmental statute. And the last thing that I would leave you with is look at the Native Ecosystems decision, the Jimtown Project. At the very end, Judge McEwen wrote, the long-term benefit of preventing stand-replacing fires, which completely destroy goshawk habitat, is preferable over any short-term benefit the goshawks might receive from retaining the dense forest structure in the project area. That's a dissent, right? No, sir. I'm actually reading from the Jimtown Native Ecosystems case in which the project was upheld. Okay. But I would urge you also to please read the dissent in the Ecology Center versus Austin case. Thank you. Thank you for your argument. I'm going to hopefully get through a couple points here. I think I'd like to start with the decade issue, which, again, is how the Forest Service, in this case, and in the Braun case, derived its snag retention scheme. And the government interveners have argued that, for example, Braun does not apply because a different snag retention scheme is at issue. But as we argued in our briefs, and I think it's important to look at, is the fact that decade was used by both the Bureau of Land Management in the Braun case and the Forest Service in this case to derive the snag retention scheme. The problem with that is, as you all mentioned, is that this is an untested methodology, and we briefed that fully in our briefs, where the district court and, in fact, the authors of the model of decade indicated that it is not for use in post-fire environments, in addition to many other flaws with this particular model. It simply doesn't apply in these types of environments. The fact that the Forest Service utilized it is indicative of a flawed project itself. Regarding the Ecology Center case, again, what that case was talking about was, again, that averaging idea. Whether or not it was okay to go outside the fire area to determine whether or not habitat was adequate. And this court rightly decided that that's not okay. You have to actually look at the activity areas to determine whether or not there's enough habitat. And Legal Wilderness Defenders believes that that was the right decision and does bear directly on this present case. There was another issue that the government discussed regarding snag fall and how these trees are going to fall down on their own accord, and whether or not we log them now is immaterial. What's important to note here is that the Northwest Forest Plan focuses on conscribing human activity in late successional reserves that have been affected by wildfire. So what we're looking at is whether or not human activity increases the rate of fall or removal of snags through logging, or whether or not these trees are going to fall of their own accord. The Northwest Forest Plan was designed with the idea that these trees will fall down over time, and that's okay. But what the logging does is actually expedite that process and then focuses on whether or not there's enough habitat left in the project area. And what we have pointed out in our briefs is that there will not be enough habitat, and that runs afoul of the Northwest Forest Plan requirements. This court also asked some good questions about balancing of the equities and what happens if the court in Brong upholds that decision. And what I would argue is that an injunction should therefore issue, hopefully from this panel in that case, in our particular case here, because you have an inadequate application or wrongful application of law in the district court, an injunction should issue. Could I ask one question? Sure. Although Judge Jones made no findings about this and the findings are fact, he did say in his order denying your motion that the plaintiff has failed to demonstrate any irreparable harm. And as you heard the intervener argue, we should affirm solely on that basis, even though you might win on the other problem. You also have to show irreparable harm. Just give us a real summary of your position on that. Well, Your Honor, our position is that Judge Jones was incorrect in finding that. We submitted several declarations, which have also been submitted before this court, showing the irreparable harm. The fact of the matter is the plaintiffs in this case enjoy or derive enjoyment from these burned areas and in their unlogged state. And as the Ninth Circuit has held many times, once you cut a tree down, you can't put it back on the stump. The irreparable harm is necessarily manifest and evident when these areas are logged. That harm is irreparable. So we believe that Judge Jones incorrectly found that there was no irreparable harm. And also I'd like to point out that what, in terms of the incorrect legal standard, what he held in his findings and recommendations was he focused on that plaintiffs had not shown any egregious violations of law, which, again, is not the standard of review in reviewing a request for a preliminary injunction. So we stand by our position that a PI should have issued in that case. Just a quick follow-up question. The irreparable harm issue that you just detailed, it seemed to me, as I read the record as much as I could, that also goes to the argument about whether there's fuel in the forest and the burning and all that stuff. So are you saying that the judge, in looking at the facts, misconstrued the facts and didn't appropriately apply the facts to you and that that was an abusive discussion because there were other facts about snags being up or down or burned or not burned and all that stuff? I mean, you're just saying if the tree is gone, there's harm. But there seems to be, again, this goes back to the science and the prognosis of what happens if you leave trees up and another fire comes along and all the rest of that. Yes. So you're saying that we should look through that and look at those facts or what? I'm suggesting that you should look at the declarations that were submitted in the case and look at where we allege harm would come from, which is essentially intervention in the post-fire landscape and logging of large-diameter trees. But you do admit that there was evidence relative to that removal. Right. And we talked about hazardous fuels reduction and that sort of thing, which again is not the concern that plaintiffs have in this case in terms of what's going on in the forest. The concern there is the removal of the trees. I just want to understand one thing, and that is that all this documentation was presented to the district court or in your request for a stay pending appeal before us? It was definitely before the district court, and I can't recall what we submitted in the request for a stay pending appeal. Or an injunction pending appeal. An injunction pending appeal. I know that our declarations were submitted in the supplemental excerpt of record, but I can check on that and we can certainly provide that information to you. Well, we have it in the record. You went through the process of appeal of injunction, went through the emergency motion panel, which then finally we got it. So apparently the appeal on the injunction included everything when they decided to deny the stay. Yes. Okay. Thank you very much. We appreciate the arguments from both sides, and the matter will be submitted. This is something I said. Can we take a short break after this one? Sure. Do you want to take one now or do you want to? I don't care. What? I don't care. The panel is going to take a ten-minute recess. Whatever you say, boss. I'll give them a chance to settle out there.
judges: Brunetti, Tashima, Paez